# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2776 | **DATE** | 2/5/2003 |
| **CASE TITLE** | Lee vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the Memorandum Opinion and Order, Defendant's motion for summary judgment [25-1] is DENIED; Plaintiff's motion for summary judgment [23-1] is GRANTED, and this case is remanded to the Commissioner for further proceedings consistent with the Opinion. Enter Memorandum Opinion and Order.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | 2-6-03 | |
| | Notified counsel by telephone. | date docketed | 30 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 2/5/2003 | |
| | Copy to judge/magistrate judge. | | |
| MW | courtroom deputy's initials | date mailed notice / MW / mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
03 FEB -5 PH 4:30
Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **HUBERT LEE,** | ) |
| **Plaintiff,** | )    **Cause No. 01 C 2776** |
| | ) |
| **v.** | )    **Magistrate Judge Geraldine Soat Brown** |
| | ) |
| **JO ANNE BARNHART,** | )    **DOCKETED** |
| **Defendant.** | ) |
| | )    **FEB 6   2003** |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Hubert Lee brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of

the decision of the Commissioner of Social Security denying his application for disability benefits

under the Social Security Act, 42 U.S.C. § 401 *et seq*. Plaintiff filed a claim for benefits in 1999.

[R.87.][1] The Commissioner denied Plaintiff's application for disability benefits. (R. 62.) Plaintiff

requested and received a hearing before an administrative law judge ("ALJ") who rendered an

unfavorable decision. (R. 11-15.) After the Appeals Council of the Social Security Administration's

("SSA's") Office of Hearings and Appeals declined his request for review (R. 4), Plaintiff filed the

present action. [Dkt# 1.] The parties have filed cross-motions for summary judgment under Fed.

R. Civ. P. 56 [Dkt# 23, 25], and have consented to the jurisdiction of a magistrate judge under 28

U.S.C. § 636(c)(1). [Dkt## 12, 13.] Thus, the decision of this Court constitutes the final ruling on

the cross-motions. For the reasons set forth below Defendant's motion for summary judgment [Dkt#

25] is DENIED and Plaintiff's motion for summary judgment [Dkt # 23] is GRANTED.

---

[1] "R" refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcript prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

*30*

## FACTUAL BACKGROUND

Plaintiff, who was sixty-one years old at the time of the hearing before the ALJ, filed a claim

of disability stating an onset date of August 10, 1999. (R. 100.) He stated that basis of his claim was

bad eye sight making him unable to do his job of driving a truck. (*Id.*) Plaintiff attended school as

far as twelfth grade but did not graduate. (R. 106.) He served in the U.S. military from 1957 to

1964, (R. 85), and worked from approximately 1966 to 1999 as a tractor/trailer driver. (R. 101.)

In 1994, Plaintiff was diagnosed by Dr. Roland Manfredi as having a supraseller lesion that

interfered with his sight. (R. 171.) Dr. Manfredi suspected a pituitary macroadenoma.[2] (*Id.*) After

performing an MRI[3], CT scan[4] and angiogram,[5] Dr. Manfredi recommended that Plaintiff have the

lesion surgically removed. (R. 171-172.) Rather than undergoing surgery, Plaintiff was treated with

drugs and his eyesight improved somewhat and stabilized. (R. 172.)

Plaintiff's medical records in the Record appear to be incomplete.[6] It is apparent, however,

that Plaintiff has been treated with a variety of medications. In 1994, he was treated with

---

[2] A pituitary macroadenoma is an adenoma larger than 10mm in diameter that tends to compress rather than invade neighboring tissue. *Stedman's Medical Dictionary* ("*Stedman's*") 24, 1050 (27th ed., Lippincott Williams Wilkins 2000).

[3] "MRI" stands for magnetic resonance imaging. It involves the use of magnetic imaging to produce a three dimensional image of the patient. *Stedman's* at 876.

[4] "CT" stands for computed tomography, anatomic information from a cross-sectional plane of the body generated by computer synthesis of x-ray transmission data. *Id.* at 1842.

[5] An angiogram is a radiograph of blood vessels taken after the injection of a contrast material. *Id.* at 81.

[6] For example, Ex.15F (R. 173) is only one page long. At the bottom of that page it says, "Continued," but there is no additional page. Plaintiff submitted that he had been treated by Dr. Kinnas from 1994 to November 1997, but there are no records of those visits. (R. 102) Similarly, one record indicates that Plaintiff was taking Bromcritin in 1994 (R. 172), but another indicates that he was not in 2000. (R. 125.) It is unclear when or why he stopped.

Bromcriptin[7] and Atenolol.[8] (R. 172.) He was also prescribed Chlorotrimeton for his sinuses. *Id.* In 1999, he was being treated with Permax.[9] (R. 175-176.) Plaintiff ceased taking Permax for a time but was prescribed by his treating neurologist Dr. Farhi to restart it. (R. 175-176.) As of 2000, Plaintiff was being treated with Xalatan[10] for eye pressure due to glaucoma, Parlodel to treat the tumor on his pituitary gland, Avapro[11] for hypertension, and Tylenol depending on the weather. (R. 122, 125, 147.)

Reports or medical records from five doctors in addition to Dr. Manfredi were admitted as evidence. Dr. Spero Kinnas, a treating ophthalmologist, completed a report in 1999 and another in 2000. (R. 134-137, 154-156.) Dr. Michael Farhi, a treating neurologist, completed a report in 2000. (R. 151-153.) Dr. Nenita Marino, a treating physician in general practice, completed a report in 1999. (R. 138-142.) Dr. Sucharita Arora, an ophthalmologist who conducted a consultive examination of Plaintiff, also completed a report in 1999. (R. 147-150.) Dr. Robert Patey completed an Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff in 2000. (R. 157-167.) In addition, Dr. Milton Scheffler, medical expert ("ME") testified at Plaintiff's hearing. (R. 43-50.)

In his 1999 report, Dr. Kinnas stated that Plaintiff suffered from optic atrophy[12] in both eyes

---

[7] Boromcriptin, sold under the name Parlodel, is used to treat high prolactin levels caused by tumors. *Bromcriptin,* <www.Rxlist.com> (visited Oct. 31, 2002)

[8] Atenolol is indicated for the management of hypertension. *Physician's Desk Reference* ("*PDR*") 692-693 (56th ed., Medical Economics Company 2002).

[9] Permax is indicated for the treatment of Parkinson's disease. *PDR* at 1299.

[10] Xalatan is indicated for the reduction of intraocular pressure in patients with open angle glaucoma and for the reduction of ocular hypertension. *Id.* at 2864.

[11] Avapro is indicated for the treatment of hypertension. *Id.* at 1074-1075.

[12] Optic atrophy is a wasting of the tissues of the eye. *Stedman's* at 165.

due to a brain tumor. (R. 135.) According to Dr. Kinnas, Plaintiff also suffered from glaucoma[13] in his left eye and Marcus Gunn Pupil[14] in his right eye. (*Id.*) Plaintiff's vison was characterized as "count fingers" (unable to read any letter in the eye chart) in his right eye (without correction), and 20/25 in his left eye (with correction). (*Id.*) Dr. Kinnas found that Plaintiff's field of vision was diminished to the point of limiting his working ability and that the use of treatment or appliances would not improve his function or employability. (R. 136.) In response to the form question, "Will visual function be further impaired by prolonged or occasional . . . [r]eading," Dr. Kinnas marked the "no" box. (*Id.*) Dr. Kinnas's 2000 report contained similar findings to his 1999 report. (R. 155.) He noted that Plaintiff's right eye could only count fingers with correction. (*Id.*) However, he also noted that Plaintiff's ability to do "work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, traveling" was unaffected by his vision. (R. 156.)

Dr. Farhi, in a brief report dated March 27, 2000, diagnosed Plaintiff with a pituitary adenoma. (R. 152.) In addition to his report, Dr. Farhi also submitted three pages of medical records. (R. 174-176.) In a 1999 "History & Physical" form, Dr. Farhi described Plaintiff as having stopped Permax, and noted a greater loss of vision. (R. 175.) Dr. Farhi recommended that Plaintiff "restart permax." (R. 176.) The record does not reflect whether Plaintiff restarted Permax. He did not report taking it in 2000. (R. 125.)

Dr. Marino's medical records indicate that Plaintiff was treated by him though the 1980's,

---

[13] Glaucoma is a disease of the eye characterized by increased intraocular pressure, excavaton and atrophy of the optic nerve. It produces defects in the field of vision. *Id.* at 748.

[14] Marcus Gunn pupil is a relative afferent defect of the pupil. *Id.* at 1486.

once in 1990, once in 1992, once in 1994, and twice in 1998. (R. 138-141.) These records appear to be for general physical examinations and do not discuss Plaintiff's vision. (*Id.*) Dr. Marino's records indicate that he treated Plaintiff for hypertension from at least 1983 through at least 1998. (R. 140-142.)

Dr. Arora conducted a consultive examination of Plaintiff for the Bureau of Disability Determination Services ("DDS") and issued a report in December, 1999. (R. 147-150.) Dr. Arora found that Plaintiff's best corrected vision was "counting fingers pin hole" in the right eye and 20/40 in the left eye. (R. 147.) Plaintiff's visual field efficiency was found to be 23% in his right eye, and 64% in his left eye. (R. 148.) Dr. Arora noted right optic disc atrophy and intraocular pressure in both eyes. (R. 148.) This pressure was controlled in the left eye with medication. (R. 147-148.) Dr. Arora noted that Plaintiff had a sub-conjunctival nevus[15] and esotropia[16] with some proptosis[17] of his right eye. (R. 148.) Finally Dr. Arora noted that Plaintiff had been diagnosed with a pituitary tumor, hypertension[18] and glaucoma. (R. 147.)

Dr. Patey completed an RFC examination of Plaintiff in 2000. (R. 157-164.) He found that Plaintiff's near and far visual acuity, depth perception, accommodation and field of vision were limited. (R. 160.) Dr. Patey also found that Plaintiff should avoid all hazards such as heights and machinery. (R. 161.) Dr. Patey concluded that Plaintiff had no exertional limitations. (R. 158.)

---

[15] A nevus is a circumscribed malformation of the skin. *Stedman's* at 1215.

[16] Esotropia is a form of strabismus (lack of visual axes parallelism) in which the visual axes converge. *Id.* at 620, 1703.

[17] Proptosis indicates falling forward. *Id.* at 1459.

[18] Hypertension is high blood pressure of a level likely to induce adverse consequences. *Id.* at 855.

At the hearing before the ALJ, Plaintiff testified that he has very little vision in his right eye, and has problems seeing with his left eye. (R. 31-32.) He cannot drive at night, but he has always worked days. (R. 31-32.) He has sinus headaches every morning. (R. 34.) He cannot read for long periods without his eyes watering. (R. 39-40.) He can read a newspaper "a little bit," depending on the print. (R. 43.) He is unable to maintain concentration while reading. (R. 42.) He testified that his vision prevented him from writing for a long period. (*Id.*) However, Plaintiff testified that he is able to drive during the day when he knows where he is going. (R. 31-32.) He is also able to watch TV for short periods of time and engage in other activities such as paying his bills. (R. 42, 118.)

Plaintiff missed approximately three months of work when his condition was initially diagnosed. (R. 100.) He testified that he missed work because he could not get "DOT status," a physical examination required by the Department of Transportation for interstate driving. (R. 29, 33.) He missed an additional month in 1998 and finally stopped working entirely in 1999. (R. 29-30.) Plaintiff stated that he would not have retired but for the fact that his declining vision prevented him from passing the test to retain his commercial drivers license ("CDL"). (R. 30, 42.) Plaintiff alleged the onset of disability August 10, 1999 (R. 62.), the day when he could no longer get his CDL. (R. 30.) It was also the day he became eligible to draw a retirement pension from his union, although not his employer, and the day he retired. (R. 28, 101.)

Dr. Scheffler, the medical expert who testified at the hearing before the ALJ, is an ophthalmologist. He testified that he had reviewed Plaintiff's medical evidence, but had not personally examined Plaintiff. (R. 44.) He testified that Plaintiff has a pituitary tumor in the region

of the brain that affects the optic nerves in both eyes. (R. 45.) Plaintiff has a complete loss of visual acuity in his right eye, which is down to counting fingers, and limited vision in his left eye. (*Id.*) With correction, Plaintiff's left eye is 20/40. (*Id.*) The ME stated that Plainitff's "reading is impaired to some degree." (*Id.*) The ME was unable to make a more specific judgment as the record did not contain a Jaeger reading ability test.[19] (*Id.*) The ME also noted that Plaintiff lacked binocular vision and depth perception. (R. 46.) The ME's conclusion was that Plaintiff does not meet the requirements for Social Security listed impairments in his left eye. (*Id.*) He further testified that Plaintiff should not drive as part of his occupation. (R. 47.) There could be further vision loss as a result of the pituitary tumor or if Plaintiff's glaucoma is not controlled. (*Id.*)

Lee O. Knutson, the vocational expert ("VE") who testified at Plaintiff's hearing, stated that he reviewed the exhibits and listened to the testimony in the hearing. (R. 51.) He testified that Plaintiff had no transferable skills. (R. 52.) The ALJ posed a hypothetical to the VE as follows: would there be jobs that could be performed by a sixty to sixty-one year old man with twelve years of schooling but no diploma, who is impaired by loss of field of vision in his right eye and decreased vision in his left eye, a lack of depth perception and binocular vison, and an inability to drive or work around dangerous machinery, but who is without exertional limitations? (R. 52.) Before answering, the VE asked whether the ability to read would be impaired at all and the ALJ responded initially that extensive reading should not be required. (R. 52.) After a break, however, and upon reviewing the record, the ALJ revised the hypothetical by concluding that there were no limits on reading. (R. 53.) The VE then stated there would be some jobs the individual could perform, such as reception or information clerk. (*Id.*) However, the VE testified, if this person could not read extensively all

---

[19] A Jaeger test is a test of the acuity of near vision. *Id.* at 1813.

jobs would be precluded. (R. 54.)

## ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520. The Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity, despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his residual functional capacity together with his age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.*

At step one the ALJ found that Plaintiff had not engaged in any substantial gainful activity since his alleged onset date. (R. 12.) The ALJ did not make an explicit step two finding; presumably the ALJ found in favor of Plaintiff because the ALJ continued to step three. At step three of the sequential analysis the ALJ concluded that Plaintiff's impairments do not meet or equal a listed impairment. (*Id.*) At step four, the ALJ found that Plaintiff had the RFC to do unskilled work "at

8

any exertional level which does not require fine vision." (*Id.*) However he concluded that Plaintiff was unable to perform his past work as a truck driver. (R. 13.) At step five the ALJ concluded that there was no evidence Plaintiff had "any physical or exertional impairments" (*Id.*) In particular, he found, based on Dr. Kinnas' reports (Exs. 1F and 6F), that Plaintiff's "ability to perform work related activities is not affected by his vision" and that Plaintiffs ability to read was not impaired. (R. 12-3.) The ALJ also found Plaintiff's testimony to be "not fully credible." (R. 13.) That determination was apparently based on the ALJ's opinion that the medical evidence did not support the level of reading limitation to which Plaintiff testified and the fact that Plaintiff's alleged onset date was also the date on which he became eligible for retirement benefits. (R. 13.) The ALJ found, based on the testimony of the VE, that there were jobs such as receptionist or light clerical worker that Plaintiff could perform and were available in significant numbers. (*Id.*) As a result the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 14.)

In the course of his decision the ALJ "noted" that Dr. Farhi had "stated that the claimant stopped taking Permax on his own which increased his loss of vison." (R. 12.) How much weight the ALJ placed on this finding is unclear. Under 20 C.F.R. § 404.1530(b) claimants who fail to follow prescribed treatment without a good reason will be found not disabled. The ALJ did not analyze whether Plaintiff had a good reason to refuse treatment, nor did he rely on that observation to support his finding that Plaintiff is not disabled.

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the

applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler,* 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. The role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater,* 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996)(Bucklo, J.). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan,* 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan,* 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala,* 22 F.3d 687, 689 (7th Cir. 1994)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron,* 19 F.3d 329, 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr,* 912 F.2d 178, 181. *See also Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989)(the ALJ has the authority to assess medical evidence and to give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of

the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *Herron*, 19 F.3d at 333. *See also Young v. Secretary of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992)(ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, at *9 (N.D. Ill. March 3, 1994)(Marovich, J.)(ALJ need not spell out every step in his reasoning, provided he has given sufficient direction that the full course of his decision may be discerned)(citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). An ALJ's opinion can not contain conflicting factual determinations. *Smith v. Massanari*, No. 00-C-7504, 2001 WL 936123 at *1-2 (N.D. Ill. Aug. 16, 2001)(Shadur, J.)

## DISCUSSION

Plaintiff raises five issues for review. He challenges the ALJ's credibility determination, the hypothetical posed by the ALJ to the VE, whether the ALJ had substantial evidence for his

11

determination of Plaintiff's RFC, whether the testimony of the VE conflicted with the Dictionary of Occupational Titles ("DOT"), and whether the ALJ disregarded evidence favorable to Plaintiff.

## A.    THE ALJ'S CREDIBILITY DETERMINATION.

The ALJ found Plaintiff's testimony regarding his visual limitations to be "not fully credible." (R. 13.) Apparently, the ALJ was referring to Plaintiff's testimony that he is unable to read or write for extended periods of time, and that he can read the newspaper a little bit depending on the print. (R. 39-43.) It is not clear what part of Plaintiff's testimony the ALJ accepted and what part he found not credible. When properly supported, an ALJ's credibility determination "is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shrameck v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) In this case, however, the ALJ's credibility finding fails to meet the requirements of SSR 97-7p, which requires that a credibility finding be supported with specific reasons supported by the record. SSR 96-7p states:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p. The ALJ may not reject Plaintiff's statements regarding his symptoms "solely because the are not substantiated by objective medical evidence. *Id.* When a decision that is fully favorable to the individual can not be made solely on the basis of objective evidence, SSR 96-7p further requires that the ALJ "carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements." *Id.*

That regulation is binding on the ALJ. 20 C.F.R. § 402.35(b). The Seventh Circuit recently reiterated the requirement that the ALJ comply with SSR 96-7p. *Brindisi v. Barnhart*, __ F.3d __,

2003 WL 61308, at * 4 (No. 02-1365)(7th Cir.).

The ALJ's determination fails the requirement in several respects. As an initial matter, the conclusion that Plaintiff's testimony about his reading limitations is not supported by the medical evidence considers only part of the medical evidence, and is based on a questionable reading of the medical record. In discounting Plaintiff's testimony, the ALJ stated that Plaintiff has a corrected vision of 20/25 in his left eye. (R.13.) While this is Dr. Kinnas's finding, both the ME and Dr. Arora found Plaintiff's corrected left eye vision to be 20/40. It is the role of the ALJ to choose between conflicting medical opinions. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996)(Keys, M.J.). However the ALJ must still "articulate his analysis at some minimal level." *Id.* at 565. Moreover, the ALJ must consider the findings of state agency physicians like Dr. Arora. 20 C.F.R. § 404.1527(f)(2)(i). The ALJ failed to offer such a minimal analysis in this case. Indeed he does not even discuss the conflicting medical opinions.

In addition, the ALJ based his finding that Plaintiff's testimony was inconsistent with the medical evidence solely on the forms completed by Dr. Kinnas, citing Exhibits 1F at 3, and 6F at 3. (R. 13.) It is not clear what part of Dr. Kinnas' response the ALJ believes contradict Plaintiff's testimony, which in itself is a problem. On the forms, Dr. Kinnas answered the preprinted question "will visual function be further impaired by prolonged or occasional . . . reading" by checking the "no" box. (R. 136, 156.) Rather than demonstrating the absence of present limitation (as suggested by the ALJ's questioning at the hearing (R. 53) although not explicit in the opinion), that question refers only to the possibility of *further* damage being caused by reading. (*Id.*) If Plaintiff were blind his visual function would not be "further impaired" by reading, but he would still be unable to read. The form also asked about Plaintiff's ability to "do work-related activities such as sitting, standing, moving about, lifting carrying, handling objects, hearing, speaking, traveling." In 1999, Dr. Kinnas responded, "patients [*sic*] visual field restriction limits his working ability." (R. 136.) In 2000, Dr. Kinnas responded, "unaffected by vision." (R. 156.) However, the form question does not address reading.

13

It is undisputed that Plaintiff is essentially blind in his right eye. The medical record provides evidence that vision in his left eye was also limited. For example, Dr. Arora, the consulting physician, reported that Plaintiff's vision in his left eye was reduced by one-fourth. (R. 148.) An earlier part of the ALJ's opinion recites the findings of Dr. Kinnas that Plaintiff's left eye visual field efficiency was 53%. (R. 12.) Dr. Kinnas' reports also describe problems with Plaintiff's left eye: "optic atrophy and glaucoma," "brain tumor and pressure." (R. 135.) Dr. Arora states that "[b]oth eyes have Chronic Conjunctival Congestion." (R. 148.) Given the undisputed fact that Plaintiff cannot read with his right eye, the ALJ is required to explain why this medical evidence about problems with Plaintiff's left eye does not support Plaintiff's testimony that he has trouble reading depending on the print and difficulty with prolonged reading, and that his eyes water if he does extensive reading.

The ALJ's credibility finding also fails to address Plaintiff's explanation for his retirement on his sixtieth birthday. The ALJ's opinion implies that the timing is evidence that Plaintiff is exaggerating his impairment in order to seek social security benefits. Plaintiff, however, offers an explanation for his behavior. Plaintiff states that, due to his vision, he was unable to obtain his CDL. Without his CDL he could not continue his job. Thus, on the day that he needed to renew his CDL, he involuntarily stopped working, and claimed disability onset on that day. The ALJ must state his reasons for accepting or rejecting "entire lines of evidence." *Herron*, 19 F.3d at 333. Rather than relying on negative inferences "the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements." SSR 96-7p. In this case the ALJ has offered no reason to reject Plaintiff's proffered explanation of his retirement date.

The ALJ's credibility finding lacks the specific factual support required by SSR 96-7p.

**B.    THE HYPOTHETICAL QUESTION POSED BY THE ALJ TO THE VE.**

Plaintiff argues that in questioning the VE and incorporating his answer into the opinion, the ALJ disregarded evidence favorable to the claimant. In questioning the VE, the ALJ did not specifically mention all of Plaintiff's medical conditions such as optic atrophy and giant aneurysm. In addition, the ALJ explicitly assumed that there were no limitations on Plaintiff's reading. (R. 53.)

Where, as here, the vocational expert has reviewed the medical reports prior to his testimony, the question need not include every detail of the claimant's impairments. *Herron v. Shalala*, 19 F. Supp. 2d 329, 337 (7th Cir. 1994); *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 540 (7th Cir. 1992). In this case the VE was present at the hearing and stated that he had reviewed the records and listened to the hearing. (R. 51.) Thus, the ALJ did not err in failing to specify all of Plaintiff's diagnosed conditions in his question to the VE.

However, the hypothetical still must set forth the claimant's impairments to the extent they are supported by the medical evidence in the record. *Herron*, 19 F. Supp. 2d at 337. Here, the ALJ initially vacillated on the question of whether Plaintiff's ability to read was limited, but ultimately directed the VE that there was no limitation on the ability to read, and that "visual function would not impair prolonged or occasional reading at all." (R. 53.)

The ALJ's decision that Plaintiff had no limitation on reading was outcome determinative. When Plaintiff's attorney added to the hypothetical an assumption of no extensive reading or that extensive reading would precipitate a lot of watering in the eye, the VE's conclusion was that Plaintiff would be unemployable. (R. 54.)

The ALJ is not obligated to include facts in his questioning to the VE that he finds unsupported in the record, but the hypothetical question must be supported by the medical evidence

in the record. *Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 540 (7th Cir. 1992)

Furthermore, "[h]ypothetical questions posed to vocational experts ordinarily must include *all* limitations suported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)(emphasis in original.) Here, the ALJ's finding that Plaintiff had no limitation as to reading was contrary to medical evidence in the record. The ME, Dr. Scheffler, testified, "His reading is impaired to some degree." (R. 45.) The ME could not be more specific because the record did not reflect a Jaeger measurement. (*Id.*) As discussed above, the ALJ has the right to choose between conflicting medical opinions, but here the ALJ's opinion simply does not mention the ME's testimony. Furthermore, the ALJ's finding that Plaintiff had no limitation as to reading itself was based on the ALJ's unsupported discounting of Plaintiff's testimony. Thus, the record fails to support the ALJ's decision to adopt the VE's answer to the hypothetical premised on no limitation rather than adopting the answers to the hypotheticals posed by Plaintiff's attorney.

The ME testified that he was unable to determine the extent of the limitation on Plaintiff's reading ability in the absence of a Jaeger test. (R. 45.) Generally, the issue of how much evidence is necessary to have a complete record is left to the ALJ's "reasoned judgment." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). However, here, where the existence of and extent of any limitation on Plaintiff's reading ability was central to the VE's opinion on employability, the ALJ should have explored whether a Jaegar test was necessary, and if he determined that it was not, explained his decision in a way that would permit the reviewing court to conclude that the decision was consistent with reasoned judgment.

C.    THE ALJ'S CONSIDERATION OF EVIDENCE.

Plaintiff argues that the ALJ failed to discuss the evidence of Plaintiff's decreased field of vision and other conditions, including cerebral atrophy and Marcus Gunn pupil. In addition Plaintiff argues that the ALJ distorted the medical evidence in one instance by interpreting notes by Dr. Farhi to mean that Plaintiff stopped taking a medication on his own initiative, which it did not explicitly state. (R. 12, 145, 175.)

The ALJ's discussed Plaintiff's limited visual acuity, his limited visual field and the existence of glaucoma and a brain tumor. (R. 12.) He failed to mention Marcus Gunn pupil. The ALJ "does not need to meet the impossible burden of mentioning *every* piece of evidence." *Parks v. Sullivan*, 766 F. Supp. 627, 634-635 (N.D. Ill. 1991)(emphasis in original). However, the Court is "interested in knowing that the Secretary has considered and discussed the 'important evidence' including 'all medical evidence that is credible, supported by clinical findings and relevant to the question at hand.'" *Anderson v. Bowen,* 868 F.2d 921, 924 (7th Cir. 1989)(internal citations omitted). In this case Plaintiff's Marcus Gunn pupil is documented by medical evidence in Dr. Kinnas' responses. (R. 135, 155.) It may be relevant to Plaintiff's claim of inability to work because of visual impairment, and thus, the ALJ was required to discuss it. On the other hand, the cerebral atrophy and the aneurysm, which Plaintiff now argues should have been discussed (Pl.'s Mem. at 11-13, 17), were not actual diagnoses. Dr. Kinnas suggested in 1994 that Plaintiff undergo further testing "to exclude the *possibility* of a giant aneurysm." (R. 173, emphasis added.) He also stated that certain symptoms were "compatible with cerebral atrophy." (*Id.*) Plaintiff fails to demonstrate that these conditions were ever actually diagnosed or that they affected plaintiff's visual ability.

In his opinion, the ALJ noted that "treating physician Dr. Farhi stated that the claimant

stopped taking Permax on his own which increased is loss of vision." (R. 12, citing Ex. 3F and 17F,

which are the same document.) Dr. Farhi's notes are ambiguous, stating only "stopped Permax" and

"restart Permax." (R.145-146, 175-176.) Because Dr. Farhi's notes are not punctuated, the

relationship between Plaintiff's decline in vision and the discontinuation of medication is likewise

ambiguous. (*Id.*) However, it is irrelevant as the ALJ choose not to rely on SSR 96-2p and 96-5p

in making his disability determination.


D.    RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff argues that the ALJ's conclusion that Plaintiff retained the residual functional

capacity ("RFC") to perform "unskilled work at any exertional level which does not require fine

vision" (R. 14), is not supported by the record.

The ALJ did not discuss his RFC finding extensively. The opinion states only that the

documentary evidence of record establishes "that the claimant has the residual functional capacity

to perform unskilled work at any exertional level which does not require fine vision .... He has no

evidence of any physical or exertional impairments." (R. 13.)[20] According to the regulation, "Your

residual functional capacity is what you can still do despite your limitations." 20 C.F.R. §

404.1545(a). Under SSR 96-8p, "The RFC assessment considers only functional limitations and

restrictions that result from an individual's medically determinable impairment or combination of

impairments ...." An RFC must be determined according to all of the available evidence including

---

[20] A non-exertional limitation is an impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull; it includes impairments which affect the mind, vision, hearing, speech, use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, or handle, or use of the fingers for fine activities. SSR 83-10. An exertional activity is any of the primary strength activities like sitting, standing, walking, lifting, carrying, pushing, or pulling. *Id.*

medical records and witness testimony. *Id.* Moreover, the ALJ's RFC determination must be

supported by substantial evidence. *Benson v. Massanari*, No. 00-C-2085, 2002 WL 1759825 at *9

(N.D. Ill. July 29, 2002)(Keys, M.J.). In this case the ALJ's conclusion is supported by such

evidence. Plaintiff offers no evidence of exertional impairments, only poor eyesight and age. As

a result the ALJ's brief analysis, stating the lack of evidence of exertional limitation, is sufficient.

Plaintiff argues that the ALJ erred in finding that Plaintiff was capable of doing heavy or very

heavy work. Under the regulations, "Very heavy work involves lifting objects weighing more than

100 pounds at a time with frequent lifting or carrying of objects weighing fifty pounds or more." 20

C.F.R. § 404.1567. Plaintiff is sixty-one years old and weighs 185 pounds. (R. 152.) Those are

not relevant factors in the RFC assessment. Under SSR 96-8p:

> The RFC assessment considers only functional limitations and restrictions that result
> from an individual's medically determinable impairment or combination of
> impairments . . . Age and body habits are not factors in assessing RFC. It is
> incorrect to find that an individual has limitations beyond those caused by his or her
> medically determinable impairment(s) and any related symptoms, due to such factors
> as age and natural body build . . .

Plaintiff is responsible for introducing evidence of his disabilities. 20 C.F.R. § 404.1512(a).

Plaintiff introduced no evidence of functional limitation due to a medically determinable impairment.

Plaintiff now argues that the ALJ ignored the condition of Marcus Gunn pupil, the possibility of an

aneurysm (R. 173) or the arterio sclerotic right eye and retinopathy in both eyes. (R. 148.) However,

Plaintiff fails to demonstrate how those conditions would affect his functional capacity in a way

other than vision impairment. Plaintiff's age is, and was, properly considered at step five of the

sequential analysis. The ALJ included Plaintiff's age in his questioning of the VE. Furthermore,

the jobs identified by the VE fell into the sedentary or light categories. (R. 54-56.) Thus, although

the ALJ did not err in this aspect of his RFC determination, if he had held that Plaintiff's RFC was

19

limited to light or sedentary work, the result would have been the same.

The ALJ's opinion stated that because Plaintiff showed no evidence of physical or exertional impairments, "Rule 204.00 in Appendix 2 Subpart P, Regulations No. 4 [the Grids] would apply and direct a finding of not disabled. However, the claimant does have a nonexertional impairment (his vision impairment) which also must be considered." (R. 13.) This, Plaintiff argues, constitutes an application of the Grids "to direct a finding of 'not disabled.'" (Pl.'s Mem at 13.) The Grids are designed to be applied only to exertional impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 200(e)(1)). Applying them to Plaintiff would be improper given the ALJ's finding that Plaintiff has a nonexertional impairment. The ALJ, however, did not apply the Grids. Rather, he stated, in a somewhat roundabout fashion, that the Grids do not apply.

### E. THE VE'S TESTIMONY AND THE DICTIONARY OF OCCUPATIONAL TITLES.

Plaintiff argues that SSR 00-4p required that the ALJ resolve any inconsistencies between the testimony of the VE and the *Dictionary of Occupational Titles* ("DOT"), and that the ALJ failed to do so. The ALJ found that Plaintiff could perform unskilled work of any exertional level. Unskilled work is work that can usually be learned in thirty days. 20 C.F.R. § 404.1568(a). Plaintiff claims that the VE testified as to job categories as available to Plaintiff in spite of his impairments that, according to their descriptions in the DOT, would take over thirty days of training. (Pl.'s Mot. at 14-16.) It does not appear that any discrepancy was identified to the ALJ at the time of the hearing (R. 25-59) or in Plaintiff's post-hearing memorandum. (R. 131-33.)

SSR 00-4p states that the DOT shall be controlling in determining the specific vocational preparation time for any occupation. It requires that, "[a]t the hearing level, as part of the

20

adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record as to whether or not there is such consistency [between the VE's testimony and the DOT]." SSR 00-4p. It further states that "[w]hen there is an apparent unresolved conflict between VE or VS [vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p.

However, SSR 00-4p was not in effect at the time of the ALJ's decision. The ALJ's decision was issued on October 27, 2000. (R. 15.) SSR 00-4p became effective on December 4, 2000. 65 Fed. Reg. 75759 (Dec. 4, 2000). SSR 00-4p states that

> This Ruling is effective on the date of its publication in the Federal Register. The clarified standard stated in this ruling with respect to inquiring about possible conflicts applies on the effective date of the ruling to all claims for disability benefits in which a hearing before an ALJ has not yet been held, or that is pending a hearing before an ALJ on remand. The clarified standard on resolving identified conflicts applies to all claims for disability or blindness benefits on the effective date of the ruling.

*Id.* at 75761. Thus, any failure of the ALJ to inquire about possible conflicts at the time of the hearing was not error. *Novak v. Barnhart*, 180 F. Supp. 2d 990, 1002 (E. D. Wis. 2001). However, SSR 00-4p will apply on the remand of this case, pursuant to the above-quoted terms of that ruling.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgement [Dkt# 25] is DENIED, Plaintiff's motion for summary judgment [Dkt# 23] is GRANTED, and this case is remanded to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: February 5, 2003**